IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MICHAEL JAMES EVANS,

                    Plaintiff,                    Case No. 3:11-cv-00272-ST

        v.                                        OPINION AND ORDER

JAMES DEACON; GREG JONES; GENELLE
MACKEY; GUY HALL; DOUG ABBOTT; and
JOSE OLVERA,

_____Defendants._____

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Michael James Evans ("Evans"), is an inmate with the Oregon Department of

Corrections ("ODOC"), currently housed at Two Rivers Correctional Institution ("TRCI") in

Umatilla, Oregon.   On March 3, 2011, Evans, appearing *pro se*, filed this case alleging that 15

ODOC officials violated his constitutional rights by failing to protect him from attack by another

inmate at TRCI in January 2010, maliciously prosecuting and improperly processing a prison rule

1 – OPINION AND ORDER

violation against him in June and July 2010, and transferring him to the Administrative

Segregation Unit ("ASU") at the Snake River Correctional Institute ("SRCI") in Ontario, Oregon,

in October 2010 in retaliation for his filing of grievances.

On February 24, 2012, this court appointed *pro bono* counsel for Evans for the sole

purpose of assisting him with the filing of an amended pleading (docket #58).   The Third

Amended Complaint ("Complaint") alleges four claims under 42 USC § 1983 against six ODOC

officials in their individual capacities:   James Deacon ("Deacon"), Greg Jones ("Jones"), Genelle

Mackey ("Mackey"), Guy Hall ("Hall"), Doug Abbott ("Abbott"), and Jose Olvera ("Olvera").

The four claims allege violations of Evans's:   (1) Fourteenth Amendment due process rights by

Jones, Hall, Mackey, and Abbott resulting from his transfer into SRCI's ASU from October 6,

2010, until March 2, 2011 ("First Claim"); (2) Eighth Amendment rights by Jones for failing to

protect him from attack by another TRCI inmate in January 2010 ("Second Claim"); (3) First

Amendment rights by Olvera for retaliating against him for filing prison grievances in December

2011 and adding Olvera as a defendant in this action in January 2012 ("Third Claim"); and

(4) Fourteenth Amendment due process rights by Deacon for denying Evans the ability to present

evidence at a disciplinary hearing concerning an incident that took place in January 2012 ("Fourth

Claim").   Evans seeks declaratory relief, as well as compensatory and punitive damages on each

of his four claims.   This court has original jurisdiction over these claims pursuant to 28 USC

§ 1331.

On May 20, 2013, all parties consented to allow a Magistrate Judge to enter final orders

and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #178).

The parties have filed the following competing motions to dismiss or for summary judgment:   (1) Defendants' (Abbott, Deacon, Hall, Jones, Mackey, and Olvera) Motion to Dismiss (docket #85) against the First and Second Claims; (2) Defendants' (Olvera and Deacon) Motion to Dismiss or for Summary Judgment (docket #87) against the Third and Fourth Claims; and (3) Plaintiff's Motion for Summary Judgment (docket #159) on all claims.   On August 20, 2012, this court advised the parties of the standards governing these motions (dockets #90 & #91).

For the reasons that follow, the First, Second and Third Claims are dismissed, and summary judgment is granted to Evans as to liability against Deacon on the Fourth Claim.

## LEGAL STANDARD

### I.    Motions to Dismiss

In order to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"   FRCP 8(a)(2).   This standard "does not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Ashcroft v. Iqbal*, 556 US 662, 678 (2009), citing *Bell Atl. Corp. v. Twombly*, 550 US 544, 555 (2007).   "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"   *Id*, quoting *Twombly*, 550 US at 555.   In order to survive a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*, quoting *Twombly*, 550 US at 570.

In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party.   *Landers v. Quality Commc'ns, Inc.*, 771 F3d 638, 640 (9th Cir 2014); *Sateriale v. R.J. Reynolds Tobacco*

*Co.*, 697 F3d 777, 783 (9th Cir 2012).   In addition to the allegations of the complaint, the court

may also consider documents whose authenticity no party questions which are attached to the

complaint, as well as matters capable of judicial notice.   *Skilstaf, Inc. v. CVS Caremark Corp.*,

669 F3d 1005, 1016 n9 (9th Cir 2012) (citations omitted); *Coto Settlement v. Eisenberg*, 593 F3d

1031, 1038 (9th Cir 2010).   Additionally, under the "'incorporation by reference' doctrine, '[e]ven

if a document is not attached to a complaint, it may be incorporated by reference into a complaint if

the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's

claim."   *Ecological Rights Found. v. Pac. Gas and Elec. Co.*, 713 F3d 502, 511 (9th Cir 2013),

quoting *United States v. Ritchie*, 342 F3d 903, 908 (9th Cir 2003) and citing *Davis v. HSBC Bank*

*Nev., N.A.*, 691 F3d 1152, 1160 (9th Cir 2012).

## II.    **Motions for Summary Judgment**

In support of their respective summary judgment motions, both Evans and defendants have

submitted copies of documents, the bulk of which are not referenced in the pleadings, but the

authenticity of which no party contests.   In addition, Evans has submitted various declarations,

some portions of which are unchallenged.   To the extent that the submittals are disputed, they

must be viewed in the light most favorable to the person against whom they are asserted.

Evans, who has for the most part proceeded *pro se*, was advised of the standards for

responding to summary judgment motions and appears well equipped to act in his own behalf.

Additionally, for the limited purpose of responding to this court's Order (docket #181) concerning

supplemental evidence and briefing, Evans is represented by counsel.

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.   FRCP 56(a).   The initial

burden is on the moving party to point out the absence of any genuine issue of material fact.   Once

the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the

production of probative evidence that there remains an issue of fact to be tried.   *Celotex Corp. v.*

*Catrett*, 477 US 317, 323 (1986).   On a motion for summary judgment, the court "draws all

justifiable inferences in favor of the non-moving party."   *Fresno Motors, LLC v. Mercedes Benz*

*USA, LLC*, 771 F3d 1119, 1125 (9th Cir 2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242,

255 (1986).

## UNDISPUTED FACTS[1]

## I.   Initial Transfer Into Protective Custody (TRCI's AHU)

Evans was admitted to ODOC custody on December 13, 2007.   *In Camera* Subm., p.

002.[2]   After initial intake at Coffee Creek Correctional Facility ("CCCF"), he was transferred to

the Oregon State Penitentiary ("OSP") on January 29, 2008.   *Id.*   A month later, Evans requested

protective custody placement due to concerns about his safety.   *In Camera* Subm., pp. 23-24.

Pursuant to that request, on March 21, 2008, ODOC officials transferred Evans into administrative

segregation at OSP.   *Id*, p. 002.   A year later, on February 26, 2009, Evans was transferred to

TRCI and housed in TRCI's Administrative Housing Unit ("AHU").   *Id.*   TRCI's AHU is an

open unit which normally houses inmates who voluntarily sign into protective custody.

///

///

---

1   In support of his motion, Evans submitted 178 pages of exhibits (docket #161).   He submitted another 25 pages of exhibits along with his Reply (docket #175) ("Reply Exhibits").   The following facts are taken from the allegations in the pleadings and the exhibits submitted by Evans, and are viewed in the light most favorable to Evans.

2   Defendants submitted *in camera* exhibits pursuant to this court's Order dated September 20, 2013 (docket #181) directing the parties to provide supplemental information on limited issues.   Notice of *In Camera* Submission (docket #184).   Citations are to the page number(s) of the *in camera* submissions.

## II. **Attack in TRCI's AHU**

Sometime in or before November 2009, inmate John Santmeyer ("Santmeyer") was transferred into TRCI's AHU.   On November 15, 2009, Jones interviewed Santmeyer for the purpose of determining an appropriate housing placement considering his behavioral history and mental condition.[3]   Complaint, ¶ 30.   Santmeyer requested a move into long-term administrative segregation (such as the ASU at SRCI) because he did not like being around so many people and warned that if he was not moved into a more solitary housing unit, he would "harm / attack someone" in TRCI's AHU.   Mattei Decl. (Reply Ex. 17), ¶ 3.

Seven weeks later, on January 3, 2010, in a common area in TRCI's AHU, Santmeyer attacked and stabbed Evans with a pencil in the face, back, and shoulder.   Complaint, ¶ 32; Reply Ex. A, p. 2.   When asked to explain why, Santmeyer stated that he had been "really upset since I talked to Lt. Jones a couple of months ago and this guy [Evans] has a bad habit of messing with me or picking at me."   Reply Ex. A, p. 2.   He also stated that Jones had "made a joke" about his request to be moved into long-term administrative segregation.   *Id*.   Santmeyer also explained during another interview that he had asked many times to be moved to long-term administrative segregation[4] and had fought with Evans because he wanted to go back to SRCI and "had problems" with Evans.   *Id*, p. 1.

---

3   Jones is presently ODOC's High Risk Placement Manager.   In that capacity, he is responsible for managing ODOC's high risk inmate population system.   The record does not reveal whether he held that position in 2010.   Evans's witness, Gino Mattei, identifies him as a "Housing Officer" who came to TRCI to "talk to certain inmates" (Plaintiff's Ex. 17, ¶ 3), and Evans stated in a grievance that Jones was "touring TRCI speaking to inmates about possible moves," apparently as part of future system-wide housing changes (Plaintiff's Ex. 1, p. 3; Evans Decl. (Plaintiff's Ex. 21), p. 11).   The record contains no documentation of Santmeyer's housing history, including whether and when he was housed in ODOC's Intensive Management Unit ("IMU"), or any information about committee meetings discussing Santmeyer's housing placement.   Thus, it is unclear whether the conversation between Jones and Santmeyer was a formal proceeding discussing Santmeyer's housing placement, or an informal discussion in the context of an facility tour to evaluate future plans for housing system needs.

4   Santmeyer also claimed to have discussed a move into long-term administrative segregation with Jeff Premo, Superintendent at OSP, where Santmeyer had been housed previously.

### III.  Allegations of Threats & Transfer to ASU

On June 5, 2010, six months after the attack by Santmeyer, a "confidential informant" reported to correctional officer P. Alleman ("Alleman") that Evans had made several comments about wanting to stab Alleman.   Plaintiff's Ex. 3 p. 1 (Misconduct Report dated June 6, 2010); Sullivan Decl., Ex. B (docket #165-2), p. 9.   Alleman interviewed four other confidential informants who all gave similar statements.   Plaintiff's Ex. 3, p. 1.   Based on Alleman's misconduct report, a disciplinary hearing convened on June 9, 2010, and Evans was found in violation of Rule 2.10 (Disrespect I) and sentenced to 21 days disciplinary segregation, 14 days of loss of privileges, and a $75.00 fine, suspended pending no major rule violations.   *Id*, p. 2; Sullivan Decl., Ex. B, pp. 7-8.

By the end of June 2010, Evans had served that 21-day sentence in the Disciplinary Segregation Unit ("DSU").   Sullivan Decl., Ex. B, p. 2 (Inmate Disciplinary Record, noting conviction date of 6/9/2010, with 21 days in DSU 6/5/10-6/25/10, 14 days LOP (loss of privileges) upon release from DSU, and a $75 suspended fine through 7/9/10).   Nevertheless, Evans contends that his October 6, 2010 transfer into SRCI's ASU was related to that event.   Plaintiff's Revised Decl. (docket #160), ¶ 2.

Upon his release from TRCI's DSU, Evans repeatedly advised Captain Steve Boston that inmates – including those who made the false allegations against him to Alleman – were making false disciplinary complaints in order to curry favor with staff or to obtain resources from monied inmates.   *Id*, ¶ 3.   Boston purportedly told Evans that if it occurred again, Evans would "not be denied [his] request for an investigation as [he] was on June 9, 2010."   *Id*; *see also* Sullivan Decl.,

Ex. B, p. 7 ("Inmate's request for witness/investigation [was] denied because the proffered evidence/testimony would not constitute a defense to the charges nor substantially mitigate the rule violations.").   Evans also became embroiled in a dispute with Alleman.

Less than two weeks after being released from the DSU, Evans was placed in the DSU again, allegedly for threatening other inmates for getting him placed in the DSU in June. Plaintiff's Ex. 9.   Alleman filed a misconduct report accusing Evans of Disrespect I.   *Id*, p. 1. Evans then filed a series of grievance forms asking that Alleman be relieved of duty, given additional training, and have a mental status or fitness for duty examination based on Evans's accusations that Alleman lied, yelled at him, and unjustifiably threatened him with placement in DSU.   Plaintiff's Exs. 6-8, 10 (p. 1), 11 (p. 1).   On August 26, 2010, the Disrespect I charge was dismissed based on insufficient evidence and "suspect" confidential informant testimony. Plaintiff's Ex. 9, p. 2.   On September 14, 2010, at least one of Evans's multiple grievances against Alleman was denied.   Plaintiff's Ex. 8, p. 4.

On September 20, 2010, Evans sent an Inmate Communication Form (also referred to as a grievance or kyte) to Steven Franke, then Superintendent of TRCI, requesting that the findings in case #1006 TRCI 0032 TRCI 25 (regarding the June 6, 2010 incident with Alleman) be overturned and dismissed because it was not investigated and upheld on the word of Joseph Scott, an inmate who had been found "suspect" in another disciplinary case (the July 3, 2010 incident which resulted in Evans being sent to the DSU a second time) for bragging to a number of others on the unit that he had twice managed to get Evans sent to the DSU.   Plaintiff's Ex. 5, p. 1.

In September 2010, Jones, Hall, Mackey and Abbott were members of the Special Population Management ("SPM") Committee.   A week after Evans sent his kyte to TRCI

Superintendent Franke, members of the SPM Committee, including Jones and Mackey, convened a meeting at which the SPM Committee decided, without explanation, that Evans would be transferred from TRCI's AHU to SRCI's ASU.[5]   *In Camera* Subm., p. 005.   The record contains no evidence indicating the basis for that transfer decision or how long it would last.   At least one document indicates that Evans was in "invol[untary] ad[ministrative] seg[regation]."   Plaintiff's Ex. 14, p. 2.

No evidence indicates that Evans was notified of or knew about the SPM Committee meeting that determined he should be transferred.   Although his transfer did not take place immediately, 11 days after the SPM Committee meeting, on October 6, 2010, Evans was transferred out of TRCI's AHU into SRCI's ASU.   The following day, Franke declined to reopen case #1006 TRCI 0032 TRCI 25 (regarding the June 6, 2010 incident with Alleman).

## IV.   Grievances Relating to the 2010 Transfer to SRCI's ASU

Within days after his transfer into SRCI's ASU, Evans filed a grievance requesting an investigation and demanding his return to TRCI.   Plaintiff's Ex. 12.   Evans stated that he had been sent to SRCI's ASU in retribution for filing grievances and, in particular, noted that Alleman had threatened to "give [Evans] a 'new address'" as retaliation against Evans for filing grievances against Alleman for harassment.   *Id*.   That grievance was returned unprocessed by the Grievance Coordinator, with a note stating that Evans needed to explain exactly what he was grieving and provide a citation to the Oregon Administrative Rules.   *Id*, p. 2.

---

5   Defendants initially declined to provide documents which might have clarified the reason(s) Evans was transferred to SRCI's ASU.   Sullivan Decl. (docket #165), ¶ 3.a. (indicating existence of a September 2010 SPM Committee Report which states that Evans will be transferred to SRCI, but declining to provide the document, citing security concerns).   In response to this court's Order to submit additional documentation, including a copy of all SPM Committee Reports concerning transfers of Evans into SRCI's ASU beginning June 1, 2010, Order (docket #181, item 2), defendants submitted notes from a September 28, 2010 SPM Committee meeting which states only that Evans "[w]ill be transferred from AHU to ASU."   *In Camera* Subm., p. 005.

On November 5, 2010, Evans filed a grievance, explaining that he felt his transfer to SRCI was based on retribution and asking for "an 'official' explanation for why I have been moved to SRCI from TRCI."   Plaintiff's Ex. 13, p. 1.   He also filed a grievance against the Grievance Coordinator, accusing her of being involved in a conspiracy and seeking an investigation as to why he had been sent to SRCI.   *Id*, p. 2.   He filed two additional grievances on November 5 and 12, 2010, requesting an "official reason for . . . being transferred from TRCI to the punitive segregation unit at SRCI."   Plaintiff's Ex. 14, p. 1.   These grievances went unprocessed, purportedly because they included too many issues and were encompassed in a tort claim that Evans had filed.   Plaintiff's Ex. 13, p. 3.

On or about January 1, 2011, Evans apparently submitted a complaint to ODOC concerning his transfer into SRCI's ASU.   The Grievance Coordinator denied the complaint, checking a box stating that the "Issue is not Grievable – Complaint has a separate appeal/review process such as conduct orders, misconduct reports, rejection/confiscation of mail, visiting, discrimination complaints, hearings, etc."   Plaintiff's Ex. 14, p. 2.   A handwritten entry indicates that Evans should "see [the] ad seg rule."   *Id.*

On January 17, 2011, Evans filed a fourth grievance concerning his transfer into SRCI's ASU, stating that he has "a right to know why I have been assigned to this housing unit and subjected to punitive sanctions when I had done nothing to deserve such treatment."   *Id*, p. 1. The same day, he submitted another grievance asserting that the conditions in SRCI's ASU amounted to cruel and unusual punishment in violation of the Eighth Amendment and requesting his return "to TRCI Adseg rather than made to suffer these punitive conditions."   Plaintiff's Ex. 15.

Evans remained in the ASU for 148 days, returning to TRCI's AHU on March 2, 2011.   *In Camera* Subm., p. 003.   A day after his transfer back to TRCI's AHU, on March 3, 2011, Evans filed this case.

## V.   <u>December 2011 Grievance & January 2012 Hearing</u>

On December 7, 2011, Evans filed a grievance against Olvera with Captain Boston. Deacon Decl. (docket #89), Ex. 2, p. 5.   The grievance alleges that Evans needed to use the typewriter to finish a motion in a legal case that was due that day, but Olvera allowed another inmate to monopolize the typewriter, in violation of the existing rules on typewriter usage.   In a "very disrespectful smart ass tone," Olvera asked Evans "where it says" that inmates have to take turns using the typewriter.   *Id.*   Evans concluded by characterizing Olvera's conduct thusly:

> In a very disrespectful smart ass tone Sgt. Olvera asked me where it says that [inmates who have already used the typewriter must let other inmates who need it have priority]?   I told him at your (Capt. Boston's) directive – He basically told me to go fuck myself.

*Id*.

The following day, Captain Boston asked Olvera to read the grievance submitted by Evans. Olvera then filed a Misconduct Report charging Evans with "Disrespect I" and "False Information to Employees I" and stating, in part, that:

> On the Communications Form, Inmate Evans accuses me of being disrespectful and in his written words, "a smart ass" when he came to the control point. . . . . Inmate Evans is misusing the Inmate Communications Form to make inappropriate comments regarding staff.

*Id*, p. 4.

Evans was in the DSU December 8-21, 2011, based on a finding that he interfered with the closing of a security device (cell door) on the evening of December 8, 2011, violating Rule 1.05.02, Property I.   Sullivan Decl. Ex. B, pp. 2-6.

On December 15, 2011, a hearings officer convened a disciplinary hearing regarding Olvera's misconduct report against Evans.   Deacon Decl., ¶ 4 & Ex. 2.   The hearings officer dismissed both listed charges based on insufficient evidence.   *Id*, Ex. 2, p. 1.   However, he found that Evans had violated the lesser included charge of Disrespect III by directing "disrespectful written statements toward Captain Boston that was directed at Sergeant Olvera" and ordered a sanction of seven days loss of privileges.   *Id*.

On January 9, 2012, Evans filed a motion to amend in this case to add a retaliation claim against Olvera.   About a week later, on or around January 18, 2012, another inmate apparently reported to ODOC officials that Evans had damaged TRCI's inmate typewriter.[6]   Plaintiff's Ex. 27.   In response to that report, Olvera told Evans he would hold Evans responsible and send him to the DSU if anyone complained about the operation of the typewriter.   *Id*.   Evans told Olvera there was no evidence of damage to the typewriter, that the typewriter was not out of service, and that bringing frivolous complaints was actionable as retaliation, to which Olvera responded that "you're already suing me, so there's nothing more you can do to me."   *Id*.

## VI.   February 2012 Disciplinary Hearing & Transfer Back to SRCI

On January 27, 2012, Kevin Hodges ("Hodges") completed a Misconduct Report concerning an incident that allegedly occurred on January 26, 2012, and was described in detail to Hodges "by staff," who apparently was Olvera.   Plaintiff's Ex. 26.   Based on the alleged

---

6 For purposes of these motions, this court accepts as true the version of these events set forth in the grievance that Evans submitted on or about February 7, 2012.   Plaintiff's Ex. 27.

incident, Evans was charged with Inmate Assault III, Extortion I & II, Disrespect I, and

Disobedience of an Order I.   Sullivan Decl., Ex. C (docket #165-3), pp. 1-5.   Evans maintains

that the January 26, 2012 incident simply did not happen.

On February 3, 2012, Deacon conducted a hearing concerning the January 27, 2012

Misconduct Report.   Deacon Decl., ¶ 7 & Ex. 3.   Deacon denied Evans's request for witnesses

and for an investigation, stating that the proffered testimony and evidence "would no[t] constitute

a defense to the charges nor substantially mitigate the rule violations."   *Id*, Ex. 3, p. 1.   Deacon

also denied Evans's request for the video footage during the 20 minutes before the incident, which

Evans maintains would have exonerated him of the charges and which was the basis of Evans's

Petition for Administrative Review filed shortly thereafter.   Plaintiff's Ex. 33, pp. 2-4.   Deacon

dismissed the charges of Inmate Assault III, Extortion I, and Disobedience of an Order I, but found

that Evans violated Disrespect I and Extortion II.   Deacon Decl., Ex. 3, p. 2.

## DISCUSSION

As noted above, the Third Amended Complaint alleges four claims against six ODOC

officials.   The first two claims concern issues which predate Evans's original complaint,

including the violation of Evans's due process rights as a result of his transfer into SRCI's ASU

from October 6, 2010, to March 2, 2011 (First Claim) and the failure to protect him from attack in

violation of the Eighth Amendment while he was housed in TRCI's AHU in January 2010 (Second

Claim).   The remaining two claims allege retaliation against Evans by Olvera in violation of his

First Amendment rights (Third Claim) and a violation of his due process rights by Deacon who

denied Evans's requests for certain evidence during a disciplinary hearing in January 2012 (Fourth

Claim).   This court finds that defendants are entitled to dismissal or summary judgment against all but the Fourth Claim.

## I.   Failure to Protect (Second Claim)

Because the Second Claim is premised upon events occurring before the events giving rise to the remaining three claims, it is addressed first.   Evans contends that Jones violated the Eighth Amendment by failing to protect him from attack in January 2010 by Santmeyer, another TRCI inmate.   Jones seeks dismissal of this claim for failure to plead sufficient facts and based on qualified immunity, while Evans seeks summary judgment on liability.

### A.   Legal Standard

Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners.   *Farmer v. Brennan*, 511 US 825, 833 (1994); *see also Hearns v. Terhune*, 413 F3d 1036, 1040 (9th Cir 2005).   However, not every injury suffered by one prisoner at the hands of another necessarily translates into constitutional liability for prison officials.   *Farmer*, 511 US at 834.   Instead, a prison official violates the Eighth Amendment only when two requirements are met:   first, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm; and second, the prison official must have a sufficiently culpable state of mind, *i.e.*, deliberate indifference to inmate safety.   *Id*.

In *Farmer*, the Supreme Court established a very demanding standard for "deliberate indifference."   The term entails something more than mere negligence, and something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. *Id* at 835.   Negligence is insufficient.   *Id*.   Even civil recklessness (the failure to act in the face of an unjustifiably high risk of harm that is so obvious that it should be known) is insufficient to

establish an Eighth Amendment violation.   *Id* at 836-37.   Similarly, it is insufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. *Id* at 843 n8.   Instead, liability follows "only if a prison official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'"   *Labatad v. Corrections Corp. of Am.*, 714 F3d 1155, 1160 (9th Cir 2013), quoting *Farmer*, 511 US at 847.

A "mere suspicion that an attack will occur is not enough."   *Berg v. Kincheloe*, 794 F2d 457, 459 (9th Cir 1986).   Instead, the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.   *Farmer*, 511 US at 837.

**B.  <u>Analysis</u>**

The Second Claim alleges that Jones violated Evans's Eighth Amendment rights by failing to protect him from attack by another inmate.   In response to Jones's motion for dismissal, Evans filed a motion for summary judgment and submitted factual information to support his allegation that Jones knew of Santmeyer's history of violent behavior.   However, it is clear that Evans's allegations are insufficient, even when illuminated by the factual information he now presents.

Santmeyer allegedly was not permitted to have cell mates due to a history of dangerous and violent behavior.   However, nothing in the pleadings or in the factual record submitted by Evans indicates that Jones had any regular contact with Evans or Santmeyer, that his office is located on the TRCI campus, or that Jones otherwise received communications from Santmeyer or Evans indicating a threat.   Instead, the Second Claim is based upon a single statement made by

Santmeyer to Jones at TRCI, apparently as part of an evaluation of methods for addressing prison housing needs.   Santmeyer allegedly told Jones in mid-November 2009 that he was not comfortable in "group" settings and "would hurt someone" if he was not removed from TRCI's AHU.   Complaint, ¶ 31.   Seven weeks later, in what Evans describes as an unprovoked attack, Santmeyer repeatedly stabbed Evans with a pencil.

The record does not reveal the nature of the "interview" between Jones and Santmeyer in November 2009.   However, whatever the context of Santmeyer's statement, there is no evidence that his threat was specifically directed at Evans, that Santmeyer made further or more specific threats between November 15, 2009, and January 3, 2010 to Jones or any other ODOC employee either generally threatening other inmates or threatening Evans in particular, that Jones was aware of any conflict between Santmeyer and Evans, that Evans complained that he felt threatened by Santmeyer, or that Santmeyer attacked or threatened any other person at TRCI's AHU during the relevant time period.   Indeed, the record is silent as to what transpired during the seven weeks between the dates that Santmeyer spoke to Jones and attacked Evans.   Instead, Evans's claim rests on his unsubstantiated hearsay assertions that Santmeyer was mentally unstable, in prison for a violent murder, and had attacked a cell mate in 2008 while housed at OSP.   Plaintiff's Ex. 1, pp. 1, 3, 5 & Ex. 2, p. 2.   Evans seems to assume that Jones knew or should have known about Santmeyer's unstable, violent history, should have concluded that he posed a risk to inmates housed in TRCI's AHU, and should have transferred Santmeyer to SRCI.

Santmeyer's general statement that he would "hurt someone" if he were not moved to more solitary housing, made nearly two months before the unprovoked attack on Evans, is simply insufficient to show "deliberate indifference" by Jones in failing to protect Evans to meet the

16 – OPINION AND ORDER

*Farmer* standard.   The alleged threat is non-specific both as to when any attack might occur and as to who might be Santmeyer's intended target(s).   And, as discussed above, other than Santmeyer's vague comment, no evidence in the record supports the conclusion that Jones knew of any facts indicating that Santmeyer posed a threat to Evans and could infer a substantial risk to Evans if Santmeyer remained in the TRCI's AHU.   Accordingly, Jones is entitled to dismissal of the Second Claim, and Evans's request for summary judgment on that claim is denied.

## II.  **PLRA Exhaustion (Third and Fourth Claims)**

Both Olvera and Deacon have moved to dismiss or for summary judgment against the Third and Fourth Claims on a variety of grounds, including a failure to exhaust as required by the Prison Litigation Reform Act ("PLRA"), 42 USC §§ 1997 *et seq*.   This preliminary issue affects two of the remaining three claims and is addressed first.

Under 42 USC § 1997e, "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   This exhaustion requirement is mandatory and requires dismissal rather than a stay when the plaintiff has not exhausted administrative remedies before filing suit, even when the plaintiff is in the process of doing so when a motion to dismiss is filed. *McKinney v. Carey*, 311 F3d 1198, 1199 (9th Cir 2002) (joining seven sister circuits).

That issue is not as cut and dry as defendants assert.   Defendants contend that the operative date for evaluating whether the Third and Fourth Claims were exhausted and when the action was brought is the date Evans filed his original Complaint on March 3, 2011   However, the operative events which form the basis of the Third and Fourth Claims took place in December 2011 and January 2012, some nine to ten months after Evans first filed this case.   The events that

form the basis of the Third and Fourth Claims were not, and could not have been, mentioned in the original Complaint, nor were they, or could they have been, mentioned in the First Amended Complaint filed on May 13, 2011 (docket #12).

The first mention of Olvera's alleged December 8, 2011 retaliation was in Evans's Motion to Amend (docket #42) filed on January 9, 2012.   In that motion, Evans sought leave to add Olvera as a defendant with respect to the exact event that forms the basis of his Third Claim. However, this court agreed with defendants that Evans's proposed Second Amended Complaint was defectively vague and, accordingly, denied the motion to amend with leave to renew and, on January 19, 2012, appointed *pro bono* counsel for the sole purpose of assisting Evans with filing a Third Amended Complaint (docket #47).

On June 18, 2012, Evans filed his Third Amended Complaint which added the Third Claim against Olvera and the Fourth Claim against Deacon.   With respect to the Third Claim, Evans alleged that he had exhausted all administrative remedies available to him to address Olvera's filing of false disciplinary reports.   Complaint, ¶¶ 41, 44, 46.   Although no such allegation is made with respect to the exhaustion of his Fourth Claim, the record reveals that Evans filed a Petition for Administrative Review of the disciplinary case which forms the basis of the Fourth Claim (No. 1201 TRCI 0186 TRCI 25).   Deacon Decl., Ex. 5, pp. 2-4.   On March 20, 2012, the Inspector General for the Oregon Department of Corrections denied Evans's request for administrative review.   *Id*, p. 1.

When an amended pleading adds a new claim, as opposed to simply clarifying or adding additional allegations with respect to an already existing claim, the issue of exhaustion is evaluated when that new claim is first alleged in the amended pleading.   *Rhodes v. Robinson*, 621 F3d 1002,

1005 (9th Cir 2010).   Exhaustion is an affirmative defense which means defendants bear the

burden of raising and proving the absence of exhaustion.   *Brown v. Valoff*, 422 F3d 926, 936 (9th

Cir 2005), citing *Wyatt v. Terhune*, 315 F3d 1108, 1119 (9th Cir 2003), *cert. denied*, 540 US 810

(2003).   Other than to contend that Evans failed to allege the Third and Fourth Claims when he

filed his original Complaint (which was an impossibility), defendants offer no grounds for finding

an absence of exhaustion.   They do not identify any administrative step Evans failed to take with

regard to the allegations of the Third or Fourth Claims prior to adding them in the Third Amended

Complaint.

Thus, defendants have failed to meet their burden of proving the affirmative defense of

PLRA exhaustion to the Third or Fourth Claims.

### III.   First Amendment Retaliation (Third Claim)

The Third Claim alleges that Olvera violated Evans's First Amendment rights by

retaliating against Evans after he filed a grievance on December 7, 2011.   Complaint, ¶¶ 38-49.

#### A.   Legal Standard

"Within the prison context, a viable claim of First Amendment retaliation entails five basic

elements:   (1) An assertion that a state actor took some adverse action against an inmate

(2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

correctional goal."   *Rhodes v. Robinson*, 408 F3d 559, 567-68 (9th Cir 2005) (internal citations

and footnote omitted).

///

///

19 – OPINION AND ORDER

B.    **Analysis**

The Third Claim alleges that Olvera violated Evans's First Amendment rights in two ways. First, Evans alleges that Olvera was aware of Evans's December 7, 2011 grievance against him for wrongfully denying Evans access to the typewriter in the law library and retaliated against Evans the next day by filing a false disciplinary report.    Complaint, ¶¶ 39-41.[7]    Second, after amending his complaint on January 9, 2012, to add a claim against Olvera (docket #42, pp. 1-2), Evans alleges that, on or about January 18, 2012,[8] Olvera filed a second false disciplinary report against him, accusing him of breaking the typewriter in the law library.    *Id*, ¶ 44.

The record reveals a longstanding and tinderbox tussle between Evans and multiple other inmates over the use of the TRCI inmate typewriter, refereed by TRCI's correctional officers, including Olvera.    Even assuming that Evans could get past the first four requirements for establishing a First Amendment claim based on Olvera's act of filing the December 8, 2011 Misconduct Report, Evan's claim misses the mark on the fifth requirement, namely that the Misconduct Report did not advance a legitimate correctional goal.    Olvera's December 8, 2011 Misconduct Report was in direct response to Evans's grievance to Captain Boston (who himself apparently found it concerning enough that he called it to Olvera's attention).    No reasonable jury could conclude that Olvera's response (the filing of the December 8, 2011 Misconduct Report) did not reasonably advance a legitimate correctional goal, namely that grievances not be used as a

---

7   Although Evans alleges that he was placed in the DSU as a result of Olvera's December 8, 2011 Misconduct Report (Complaint, ¶41), the record reveals that Evans was placed in the DSU because he had interfered with the closing of a cell door.    Sullivan Decl. Ex. B, pp. 2-6.

8   The pleadings give the date as January 18, 2011, but it is clear from the context that this is a typographical error and the year should be 2012.

mechanism for directing hostile or abusive language toward or about another person.

Accordingly, exhausted or not, this portion of Evans's Third Claim fails on the merits.

This leaves only the second allegation of the Third Claim, namely that Olvera filed a false disciplinary report against Evans on or about January 18, 2012, soon after Olvera learned that Evans had sought to amend his pleadings to include the Third Claim.   Evans was placed in the DSU December 8-21, 2011, based on a finding that he interfered with the closing of a security device (cell door) on the evening of December 8, 2011, violating Rule 1.05.02, Property I. Sullivan Decl. Ex. B, pp. 2-6.   A little more than a month later, Evans was charged with Inmate Assault III, Extortion I & II, Disrespect I, and Disobedience of an Order I based on an incident that took place on January 26, 2012.   *Id*, Ex. C, pp. 1-5.   The investigation into that incident revealed that, on "January 18, 2012, Inmate Evans was being counseled in regards to the Unit Typewriter," prompting Evans to respond that he was being harassed by Olvera and Hodges and intended to file another lawsuit.   *Id*, p. 4.

Defendants point out that there is no Misconduct Report dated January 18, 2012.   In response, Evans clarifies that:   (1) on January 15, 2012, he was "called to the office to answer charges before Capt. Lytle that there had been 'reports' that [Evans] had made threats he would physically attack Olvera;" and (2) on January 18, 2012, Olvera told Evans that "you're already suing me, so there's nothing more you can do to me."   Plaintiff's Decl. for Motion for Summary Judgment, Revised (docket #160), p. 7, ¶ 19 & p. 8, ¶ 24.   Evans asserts that, on January 18, 2012, he was wrongfully accused of damaging a typewriter.   Plaintiff's Response to Defendants' Response to Plaintiffs' 2nd Motion for Summary Judgment (docket #173), p. 4.   This was the subject of a grievance filed by Evans on February 7, 2012, which, as explained above, charges that

Olvera told Evans that he would hold Evans responsible and send him to the DSU if anyone complained about the operation of the typewriter.    Plaintiff's Ex. 27.

The difficulty with Evans's assertions in the Third Claim is threefold.    First, other than the mere fact that Captain Lytle and Olvera told Evans that other inmates had accused him of threatening Olvera and damaging the TRCI inmate typewriter, nothing indicates that any action at all was taken against Evans.    Second, the record indicates that Captain Lytle and Olvera were responding not to some constitutionally protected activity by Evans, but to a report (on or about January 15, 2012) that Evans would attack Olvera and to a report (on or about January 18, 2012) that Evans had damaged the TRCI inmate typewriter.    Third, no reasonable jury could conclude that discussing reported misconduct with the accused inmate does not reasonably advance a legitimate correctional goal.    The record simply is insufficient to establish a First Amendment retaliation claim under the standard set forth in *Rhodes*.

Accordingly, Olvera is entitled to summary judgment against the Third Claim.

## IV.    Violations of Due Process (First and Fourth Claims)

The remaining two claims take aim at the transfer of Evans out of the open housing provided in TRCI's AHU into SRCI's ASU (First Claim) and at the denial of Evans's request for certain evidence related to a later disciplinary charge that resulted in his transfer into the DSU for 30 days (Fourth Claim).    Though premised upon events several years apart, these claims each allege violations of Evans's Fourteenth Amendment due process rights.    Because it involves a somewhat more limited issue, the Fourth Claim is addressed first.

///

///

22 – OPINION AND ORDER

### A.   Denial of Opportunity to Present Evidence (Fourth Claim)

The Fourth Claim alleges that Deacon violated Evans's due process rights in the disciplinary proceedings addressing the January 26, 2012 incident.   In particular, Evans alleges that Deacon denied his request for the questioning of witnesses and the review of videotape evidence.   Deacon asserts that he is entitled to qualified immunity against this claim and that it fails on the merits because Evans received "all the process he was due" and the findings against Evans were based on "some evidence."

#### 1.   Legal Standard

In the prison disciplinary context, procedural due process is satisfied if the inmate receives: (1) written notice of the charges; (2) a brief period of time after the notice to allow for preparation; (3) a written statement of the evidence relied on and the reasons for the disciplinary action; (4) a limited right to call witnesses and present documentary evidence; and (5) if the inmate is illiterate, allowance to seek the assistance of a fellow inmate or prison staff.   *Wolff v. McDonnell*, 418 US 539, 563-70 (1974).

#### 2.   Analysis

Deacon avers that at the hearing, he "received information from several confidential informants, as well as multiple staff members, each indicating that . . . Evans had engaged in extortion on several dates, and in several locations" and that the "information constituted overwhelming evidence that inmate Evans had participated in prohibited conduct on at least one occasion."   Deacon Decl., ¶ 9.   As justification for his denial of the request that Evans made during the disciplinary hearing for "review of the January 26, 2012 video footage," Deacon asserts that "[e]ven if this evidence demonstrated that inmate Evans hadn't engaged in prohibited conduct

23 – OPINION AND ORDER

on January 26, 2012, it would not have shown that Evans didn't engage in prohibited conduct on other dates as the multiple confidential informants and confidential staff reports indicated." *Id*, ¶ 10.

This line of reasoning presents two problems. First, Evans was charged with specific conduct on a specific date at a specific time. The alleged extortion at issue during the February 3, 2012 hearing took place on January 26, 2012, at "approximately 0310 Pm" (Plaintiff's Ex. 26, p. 1), not on some other unidentified date at some other unidentified time. Due process means nothing at all if a violation may be found based on conduct not specified in the notice of the charges. Second, no reasonable person could conclude that the evidence requested by Evans would not constitute a defense or substantially mitigate the rule violations. Evans flatly denies that the January 26, 2012 incident took place. Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment as Per Doc. 181 and Supplemental Brief ("Plaintiff's Memo.") (docket #190), p. 42 (the "charged offense never occurred" and "nothing charged had in reality occurred"). He asserts that the witnesses he sought would have countered any assertion of his proximity to the alleged victim, that financial documents would have shown he had no motive to engage in extortion, and that the requested video footage would have "been dispositive of [his] non proximity" to the alleged victim. *Id*, p. 44.

Deacon apparently concluded that even if Evans did not commit extortion at the exact date and time charged, Evans did commit extortion at some point based on "multiple confidential informants and confidential staff reports." Deacon Decl., ¶ 10. Although this conclusion may be absolutely reasonable, especially in the prison context, it does not comply with the minimal due process requirements of notice and an opportunity to be heard. Deacon could easily have given

24 – OPINION AND ORDER

notice to Evans of these additional incidents of alleged extortion, but did not do so.   Deacon also could have easily allowed Evans to submit additional evidence, but did not do so and simply rejected it as less credible than the confidential informants and staff.   Therefore, this court must conclude that Deacon violated Evans's Fourteenth Amendment due process rights in the disciplinary proceedings addressing the January 26, 2012 incident.

Accordingly, Evans is entitled to summary judgment in his favor as to liability on the Fourth Claim against Deacon.   Despite this violation of due process, Evans may well have suffered no harm, given that he was also found guilty of violating Rule 2.10, Disrespect I. However, the appropriate remedy is not at issue at this juncture.

**B.   Transfer Into SRCI's ASU**

This leaves only the First Claim alleging that defendants Jones, Hall, Mackey, and Abbott, who were members of TRCI's SPM Committee, violated Evans's due process rights by transferring him from TRCI's AHU into SRCI's ASU on October 6, 2010, where he remained for the next five months.   Evans alleges that the transfer took place without a disciplinary report and without a hearing, was for an indeterminate amount of time, and lasted for 148 days, all of which violated his Fourteenth Amendment due process rights.   He seeks compensatory and punitive damages against each individual defendant in their individual capacity.

Evans also challenges his subsequent stay in SRCI's ASU beginning February 13, 2012. *In Camera* Subm., pp. 002-003 (housing history); Plaintiff's Response to Defendants' Supplemental Briefing ("Plaintiff's Response") (docket #224), p. 7.   Evans contends that the only "review" he received of the 2012 transfer into SRCI's ASU was a sham hearing in early 2013, presided over by Jones.   Plaintiff's Memo., pp. 16-17.   However, the First Claim only addresses

25 – OPINION AND ORDER

the time Evans spent in SRCI's ASU from October 6, 2010, to March 2, 2011.   Therefore, this court cannot address the 2012 transfer.

### 1.  **Legal Standard**

Defendants assert that they are entitled to dismissal of the First Claim both because Evans has not shown a violation of any constitutionally protected liberty interest and because they are entitled to qualified immunity.   This court agrees with Evans that current Ninth Circuit law indicates that a liberty interest is implicated by the lengthy transfer into extremely restrictive housing with no opportunity for meaningful review.   However, by the thinnest of margins, this court concludes that defendants are entitled to qualified immunity because this law was not clearly established at the time of the events giving rise to Evans's First Claim.

The Constitution "itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."   *Wilkinson v. Austin*, 545 US 209, 221 (2005), citing *Meachum v. Fano*, 427 US 215, 225 (1976).   However, "a liberty interest may arise from state policies or regulations."   *Id* at 222.   The conditions of confinement may implicate a protected liberty interest by imposing an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."   *Sandin v. Conner*, 515 US 472, 484 (1995) (no liberty interest in 30-day assignment to segregated confinement).   Accordingly, inmates have a liberty interest protected by the Fourteenth Amendment's due process clause in avoiding an indefinite assignment to the highly restrictive conditions of a state's "supermax" prison.   *Wilkinson*, 545 US at 224.

Even if Evans states a potential violation of a protected liberty interest, defendants are protected from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Tarabochia*

*v. Adkins*, 766 F3d 1115, 1121 (9th Cir 2014) (internal quotation marks and citations omitted). The qualified immunity doctrine is an "immunity from suit . . . that ensures that 'officers are on notice that their conduct is unlawful' before being subjected to suit."   *Id*, quoting *Hope v. Pelzer*, 536 US 730, 739 (2002).   The doctrine "strikes a balance between 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"   *Id*, quoting *Pearson v. Callahan*, 555 US 223, 231 (2009).   In evaluating entitlement to qualified immunity, this court considers:   "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'"   *Id*, quoting *Robinson v. York*, 566 F3d 817, 821 (9th Cir 2009).   "The standard is one of fair warning:   where the contours of the right have been defined with sufficient specificity that a state official had fair warning that his conduct deprived a victim of his rights, he is not entitled to qualified immunity."   *Serrano v. Francis*, 345 F3d 1071, 1077 (9th Cir 2003) (internal quotation marks, brackets, and citations omitted).   "Whether the defendants violated a constitutional right and whether the right was clearly established at the time of the violation are questions of law."   *Sandoval v. Las Vegas Metro. Police Dept.*, 756 F3d 1154, 1160 (9th Cir 2014), *petition for cert. filed*, 83 USLW 3352 (Nov. 6, 2014) (No. 14-528).

### 2.   Supplemental Submissions

In response to this court's request, the parties submitted detailed information concerning the conditions in each of the three units in which ODOC housed Evans.   Plaintiff's Memo., pp. 2-9; Defendants' Supplemental Briefing (docket #199); Plaintiff's Response.   In addition, the

27 – OPINION AND ORDER

parties submitted detailed briefing concerning the application of the Oregon Administrative Rules as they pertain to housing transfers.   Finally, defendants submitted a detailed analysis of how the transfer affected Evans's sentence and earned time credits or any other sentence reduction programs.

 This court has exhaustively reviewed these voluminous and detailed submissions, compared the conditions of SRCI's ASU to the "supermax" prison conditions at issue in *Wilkinson*, and considered what relief Evans may be due as a result of the dearth of evidence provided at any hearing prior to his transfer into SRCI's ASU or any opportunity for review of that transfer as the Oregon Administrative Rules clearly contemplate.   This court is convinced that the record supports Evans's contention that due to its conditions, SRCI's ASU is not simply one of a range of "housing options" into which ODOC may summarily transfer an inmate with no opportunity to be heard and with no opportunity for review.   Nevertheless, Evans gains no more than a moral victory.   The undisputed evidence and a review of the case law reveals that defendants are entitled to qualified immunity from the damages Evans seeks in the First Claim.

 The SPM Committee transferred Evans to SRCI's ASU from October 6, 2010, until March 2, 2011.   Evans contends that this transfer deprived him of a liberty interest without adequate process, citing Oregon Administrative Rules.   According to Evans, these rules require that any involuntary transfer of an inmate to an ASU for more than 30 days requires ODOC to follow a hearing process which he did not receive.[9]   Defendants contend that they are entitled to

---

[9]   Involuntary retention in administrative segregation based on the functional unit manager's finding of a need to "protect the safety, security, and orderly operation of the facility," is limited to no more than 30 days, while a finding of an "immediate and continuing threat to the safety, security, and orderly operation of the facility" will support retention in administrative segregation for periods exceeding 30 days.   OAR 291-046-0025(1) and (2).   However, inmates "placed in involuntary administrative housing exceeding 30 days will receive a hearing by a hearings officer," OAR 291-046-0025(4), and the "assignment shall not exceed 180 days without due process."   OAR 291-046-0085(2).   Moreover, "[i]nmates assigned to administrative housing shall remain so assigned for only the shortest length of time necessary to achieve the purpose for which the assignment was prescribed" and a

dismissal of – or qualified immunity against – the First Claim because Evans has failed to identify any protected liberty interest.   These contentions are premised on two notions, namely that Evans has no protected liberty interest in a "choice of prison housing" and that a state level procedural regulation does not *per se* create a liberty interest.   Evans counters with a request for summary judgment on the First Claim.

Striking parallels exist between this case and certain aspects of *Wilkinson*.   As the supplemental evidence establishes, the restrictive conditions of SRCI's ASU differ significantly from those imposed on inmates housed in TRCI's AHU.   This court will not belabor those solitary confinement conditions.   Suffice it to say that if the physical conditions and restraints were alone determinative of the question of the existence of a liberty interest, Evans might well be entitled to summary judgment on the First Claim.   However, the liberty interest found in *Wilkinson* was predicated on two additional considerations, namely that the placement:   (1) was "indefinite [in duration] and, after an initial 30-day review, is reviewed just annually;" and (2) "disqualifie[d] an otherwise eligible inmate for parole consideration."   *Wilkinson*, 545 US at 224.

Evans argues, and the record supports the conclusion, that his placement was likewise indefinite in duration.   Evans's repeated requests for some explanation of his transfer, or transfer back to TRCI's AHU, were summarily snubbed.   His transfer back did not occur until five months later, and the record reveals nothing about what prompted that transfer.   Although Evans's multiple grievances were denied, in part based on the availability of Oregon Administrative Rules relating to involuntary transfers into administrative segregation (Plaintiff's Ex. 14, p. 2), no

---

"review of all inmates' status will be made every 30 days by the institution Special Needs Inmate Evaluation Committee."   OAR 291-046-0090(1).

evidence indicates that Evans's transfer was ever reviewed under those rules.   Thus, this factor also pushes the circumstances of this case closer to those of *Wilkinson*.

However, the First Claim falters on the next consideration.   It is undisputed that Evans's transfer into SRCI's ASU had no effect whatsoever on the duration of his sentence and no effect on any earned time credits.   Nowak Decl., ¶¶ 5-6.   Were it otherwise, Evans might successfully have argued that his transfer into SRCI's ASU in October 2010 was indistinguishable from the placement at issue in *Wilkinson*.   However, "[g]overnment officials who perform discretionary functions generally are entitled to qualified immunity from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Brown v. Oregon Dept. of Corr.*, 751 F3d 983, 989 (9th Cir 2014), quoting *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).

Recently in *Brown*, the Ninth Circuit noted its previous holding that "lengthy confinement without meaningful review may constitute atypical and significant hardship" and, on that basis, determined that the defendants were entitled to qualified immunity.   *Id* at 989-90.   Evans correctly points out that, unlike *Wilkinson*, *Brown* involved the lack of periodic review. Nevertheless, as in *Brown*, this case involves an issue on which there was no clear guidance at the time of Evans's 2010 transfer into SRCI's ASU.   Liberally read, *Brown* may be interpreted to implicate a liberty interest any time that an inmate faces "lengthy confinement without meaningful review" in a housing unit with conditions which differ significantly from those imposed in whatever housing unit constitutes the "appropriate baseline."   *Brown*, 751 F3d at 988.   However, Evans has not cited, nor has this court found, any case predating Evans's transfer on October 6, 2010, which established a liberty interest without regard to the effect of the transfer on duration of

30 – OPINION AND ORDER

the inmate's sentence.   *Wilkinson*, decided in 2005, identified that component as part and parcel of its finding of a liberty interest.   Some argument can be made that the lack of an effect on the length of a sentence was not critical to its decision.   But until the Ninth Circuit decided *Brown* in 2014, no controlling case even arguably established that the duration component was optional.

In sum, at the time of the transfer challenged in the First Claim, there was no clearly established due process right to challenge a prison housing placement, absent evidence that the placement not only subjected the inmate to atypical and significant hardships and was of indefinite duration and only limited review, but also had some effect on the inmate's consideration for sentence reductions.   Accordingly, defendants are entitled to qualified immunity against the First Claim.

## ORDER

For the reasons set forth above, the parties' motions are granted in part and denied in part, as follows:

(1)   Defendants' Motion to Dismiss (docket #85) the First Claim on the basis of qualified immunity and the Second Claim for failure to state a claim is GRANTED;

(2)   Olvera's Motion for Summary Judgment (docket #87) against the Third Claim is GRANTED;

(3)   Deacon's Motion for Summary Judgment (docket #87) against the Fourth Claim as to liability is DENIED; and

(4)   Plaintiff's Motion for Summary Judgment (docket #159) is GRANTED as to liability against Deacon on the Fourth Claim and otherwise is DENIED.

As a result, the only remaining claim is the amount of damages recoverable by Evans against Deacon on the Fourth Claim.   The court will set a telephone conference call in the near future to discuss the remainder of the case schedule.

DATED this 20th day of January, 2015.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

32 – OPINION AND ORDER